ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
LAW OFFICES OF ANDREW L. PACKARD
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4061
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

REED SUPER (State Bar No. 164706)
SUPER LAW GROUP, LLC
180 Maiden Lane, Suite 603
New York, NY 10038
(212) 242-2355
reed@superlawgroup.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, | Case No. |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |
| v. | |
| WEST CONTRA COSTA SANITARY LANDFILL, INC., ROB SHERMAN, ED BAQUERIZO, AND ROBERT BOYER, | **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1387)** |
| Defendants. | |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA"), by and through

its counsel, hereby alleges:

I.    **JURISDICTION AND VENUE**

1.     This is a civil suit brought under the citizen suit enforcement provision of the

Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (the "Clean Water Act", the

"CWA" or "the Act") against West Contra Costa Sanitary Landfill, Inc., Rob Sherman, Ed

Baquerizo, and Robert Boyer ("Defendants").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce effluent standard or limitation).  The relief requested is authorized pursuant to 33 U.S.C. §1365(a) (injunctive relief), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.      On August 24, 2020, Plaintiff provided written notice to Defendants, via certified mail, of Defendants' violations of the Act ("Notice Letter"), and of its intention to file suit against Defendants, as required by the Act.  *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1).  Plaintiff mailed a copy of the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); and the Executive Officer of the Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board"), pursuant to 40 C.F.R. § 135.2(a)(1).  A true and correct copy of the Notice Letter is attached hereto as **Exhibit A** and is incorporated by reference.

3.      More than sixty days have passed since Plaintiff served the Notice Letter on Defendants and the agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced nor is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action's claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this District.  Venue is also proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  Intra-district venue is proper in either San Francisco or Oakland, California, because the sources of the

1   violations are located within Contra Costa County.

2   **II.    INTRODUCTION**

3          5.     This Complaint seeks relief for Defendants' violations of the CWA at the

4   approximately 340-acre landfill facility located at Foot of Parr Boulevard, in Richmond,

5   California ("Facility").  Defendants discharge pollutant-contaminated storm water from the

6   Facility into San Pablo Bay, San Pablo Creek, and a large lagoon south of the Facility ("Pond

7   B").  San Pablo Bay, San Pablo Creek, and Pond B (the "Impacted Waters") are waters of the

8   United States within the meaning of the Clean Water Act.  Defendants are in violation of both

9   the substantive and procedural requirements of the CWA.

10         6.     Defendants' discharges of polluted storm water from the Facility violate Section

11  301 of the Act, which prohibits the discharge of storm water associated with industrial activities

12  to waters of the United States except in compliance with the terms of a National Pollutant

13  Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33

14  U.S.C. § 1342.  These violations are ongoing and continuous.

15         7.     Defendants' discharges of polluted storm water from the Facility violate the State

16  of California's General Industrial Permit for storm water discharges, State Board Water Quality

17  Order No. 91-13-DWQ, *amended by* Nos. 92-12-DWQ, 97-03-DWQ, 14-0057-DWQ, NPDES

18  General Permit No. CAS000001 (hereinafter "General Permit" or "Permit").  Defendants'

19  violations of the permitting, filing, monitoring, reporting, discharge and management practice

20  requirements, and other procedural and substantive requirements of the General Permit and the

21  CWA are ongoing and continuous.

22         8.     The failure on the part of industrial facility operators, such as Defendants, to

23  apply for and comply with the General Permit is recognized as a significant cause of the

24  continuing decline in water quality of receiving waters.  The general consensus among regulatory

25  agencies and water quality specialists is that storm water pollution amounts to more than half the

26  total pollution entering the aquatic environment each year.  With every rainfall event, hundreds

27  of thousands of gallons of polluted storm water originating from industrial facilities discharge to

28  the impacted waters.

**III.**     **PARTIES**

9.     Defendant West Contra Costa Sanitary Landfill, Inc. is a California corporation.

10.     Defendant West Contra Costa Sanitary Landfill, Inc. is a wholly-owned subsidiary of Republic Services, Inc.

11.     Defendant West Contra Costa Sanitary Landfill, Inc. is the owner of the Facility.

12.     Defendant Rob Sherman is the General Manager at the Facility.

13.     Defendant Ed Baquerizo is the Environmental Manager at the Facility.

14.     Defendant Robert Boyer is the Chief Executive Officer of West Contra Costa Sanitary Landfill, Inc.

15.     Defendants Rob Sherman, Ed Baquerizo, and Robert Boyer are responsible for operating the Facility.

16.     Plaintiff California Sportfishing Protection Alliance ("CSPA") is a non-profit public benefit corporation organized under the laws of California, with its main offices in Stockton, California.  CSPA is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California waters, including the waters into which Defendants discharge polluted storm water.  To further its goals, CSPA actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and directly initiates enforcement actions on behalf of itself and its members as necessary.

17.      Members of CSPA—including citizens, taxpayers, property owners, and residents—live, work, travel, and recreate on and near the Impacted Waters, into which Defendants cause pollutants to be discharged.  These members of CSPA use and enjoy the Impacted Waters for recreational, educational, scientific, conservation, aesthetic, and spiritual purposes.  Defendants' discharges of storm water containing pollutants impairs each of those uses.  Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the CWA and the General Permit.

18.     Members of CSPA reside in California and use and enjoy California's numerous rivers for recreation and other activities.  Members of CSPA use and enjoy the Impacted Waters, into which Defendants have caused, are causing, and will continue to cause, pollutants to be

1    discharged.  Members of CSPA use these areas to hike, fish, boat, kayak, swim, bird watch, view

2    wildlife, and engage in scientific study, including monitoring activities, among other things.

3    Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such

4    threats and impairments.  Thus, the interests of CSPA's members have been, are being, and will

5    continue to be adversely affected by Defendants' ongoing failure to comply with the CWA.  The

6    relief sought herein will redress the harms to Plaintiff caused by Defendants' activities because that

7    relief will significantly reduce pollution discharged from Defendants' Facility into the Impacted

8    Waters.

9         19.    Continuing commission of the acts and omissions alleged above will irreparably

10   harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy

11   or adequate remedy at law.

12   **IV.    LEGAL BACKGROUND**

13        **A.    Clean Water Act**

14        20.    Congress enacted the CWA to "restore and maintain the chemical, physical, and

15   biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The CWA establishes an

16   "interim goal of water quality which provides for the protection and propagation of fish,

17   shellfish, and wildlife and provides for recreation in and on the water . . . ."  33 U.S.C. §

18   1251(a)(2).  To these ends, Congress developed both a water quality-based and a technology-

19   based approach to regulating discharges of pollutants from point sources into waters of the

20   United States.

21        21.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

22   pollutant from a point source into waters of the United States, unless such discharge complies

23   with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits

24   discharges not in conformance with a NPDES permit, such as discharges without a NPDES

25   permit or discharges that violate the terms of an NPDES permit issued pursuant to Section 402 of

26   the Act (33 U.S.C. §1342).

27        22.    The term "discharge of pollutants" means "any addition of any pollutant to

28   navigable waters from any point source."  33 U.S.C. § 1362(12).  Pollutants are defined to

include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).

23.     A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

24.     "Navigable waters" means "the waters of the United States."  33 U.S.C. § 1362(7).  Waters of the United States includes, among other things, waters that are, were, or are susceptible to use in interstate commerce and tributaries to such waters.  40 C.F.R. § 230.3 (2015).  Section 402 of the Act, 33 U.S.C. § 1342, establishes the NPDES program—a permitting program that regulates the discharge of pollutants into waters of the United States. Section 402(p) establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and, specifically, requires a NPDES permit for storm water discharges associated with industrial activity.  33 U.S.C. § 1342(p)(2)(B). Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges, through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).

25.     Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); 33 U.S.C. § 1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [Section 402] of this title," and "any unlawful act under subsection (a) of [Section 301] of this title").

26.     An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $55,800 per day per violation for all violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. §§ 19.1–19.4.

**B.**     **State Regulations**

27.     The CWA requires states to promulgate water quality standards. *See* 33 U.S.C. §§ 1313(a)-(c). Water quality standards consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for its designated uses. 33 U.S.C. § 1313(c)(2)(A). The CWA requires states to assess whether these water quality standards are being met.

28.     San Pablo Bay is heavily degraded from pollutant loading. This is officially recognized by the EPA, the State Board, and the Regional Board, which have placed the waterbody on the CWA Section 303(d) list of waters that are so polluted that they do not meet applicable water quality standards. The Regional Board's Water Quality Control Plan for the San Francisco Bay (hereafter referred to as the "Basin Plan") is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in the Region.

**C.**     **California Industrial Storm Water General Permit**

29.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized the State Board to issue NPDES permits in California, including general permits.

30.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997 and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

31.     Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI"). The General Permit requires facilities to file their NOIs before the initiation of industrial operations.

32.     Once regulated by a NPDES permit, facilities must strictly comply with all of the terms and conditions of that permit. A violation of the General Permit is a violation of the Act. *See* General Permit, Section XXI.A.

33.     To discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

34.     The General Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions, receiving water limitations, and effluent limitations; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

35.     Discharge Prohibition A prohibits all discharges of storm water to waters of the United States except as specifically authorized by the General Permit or another NPDES permit. General Permit § III.A.

36.     Discharge Prohibition B prohibits discharges of liquids or materials other than storm water, directly or indirectly, to waters of the United States unless authorized by another NPDES permit, except for specifically authorized non-storm water discharges enumerated in Section IV.  General Permit § III.B.

37.     Discharge Prohibition C prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance as defined in Section 13050 of the California Water Code.  General Permit § III.C.

38.     Discharge Prohibition D prohibits discharges that violate any discharge prohibition contained in an applicable regional water board water quality control plan or statewide water quality control plans and policies.  General Permit § III.D.

39.     The Basin Plan prohibits the discharge of "[r]ubbish, refuse, bark, sawdust, or other solid wastes into surface waters or at any place where they would contact or where they would be eventually transported to surface waters, including flood plain areas."  Basin Plan, Table 4-1.  The following narrative standards also apply: "[w]aters shall not contain floating material, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses"; "[w]aters shall not contain substances in concentrations that result in the deposition of material that cause nuisance or adversely affect beneficial uses."  Basin Plan, §§ 3.3.6, 3.3.13.

40.     Receiving Water Limitation A of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water.  General Permit § VI.A.

41.     Receiving Water Limitation B prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  General Permit § VI.B.

42.     Receiving Water Limitation C prohibits industrial storm water discharges that contain pollutants in quantities that threaten to cause pollution or a public nuisance.  General Permit § VI.C.

43.     The Basin Plan identifies applicable water quality standards, including present and potential beneficial uses for the San Pablo Bay.  These beneficial uses include industrial service water supply, commercial and sportfishing, shellfish harvesting, estuarine habitat, fish migration, preservation of rare and endangered species, fish spawning, wildlife habitat, contact and noncontact water recreation, and navigation.

44.     The State Board's 2014/2016 California Integrated Report (Clean Water Act Section 303(d) List/305(b) Report) lists the following impairments for San Pablo Bay: chlordane, dichlorodiphenyltrichloroethane, dieldrin, dioxin compounds (including 2, 3, 7, 8-TCDD), furan compounds, invasive species, mercury, polychlorinated biphenyls, and selenium.  San Pablo Creek is impaired for diazinon and trash.

45.     The General Permit requires dischargers to prepare and submit documentation to the Regional Board upon determination that storm water discharges are occurring in violation of the General Permit's Receiving Water Limitations.  General Permit § XX.B.

46.     Effluent Limitation A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  General Permit § V.A.

47.     EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT

1   standards.  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  The following benchmarks have been

2   established for pollutants discharged by Defendants: Total Suspended Solids ("TSS") – 100

3   mg/L; Oil & Grease ("O&G") – 15.0 mg/L; Iron ("Fe") – 1.0 mg/L; Zinc ("Zn") – 0.26 mg/L;

4   Aluminum ("Al") – 0.75 mg/L; Chemical Oxygen Demand ("COD") – 120 mg/L; Nitrate plus

5   Nitrite Nitrogen ("N+N") – 0.68 mg/L; Phosphorus ("P") – 2.0 mg/L; and pH – between 6 and 9

6   s.u.

7        48.     The General Permit also incorporates Effluent Limitation Guidelines ("ELGs")

8   for industrial storm water discharges from facilities in specific industrial categories.  General

9   Permit § I.K.

10       49.     Landfills are subject to the storm water ELGs identified in Attachment F of the

11  General Permit.  General Permit § V.B.

12       50.     Landfills that discharge "contaminated storm water," 40 C.F.R. §§ 445.2(b), (f),

13  must achieve the following effluent limitations, which represent the application of best

14  practicable control technology currently available and the best conventional pollutant control

### EFFLUENT LIMITATIONS

| Regulated parameter | Maximum daily [1] | Maximum monthly avg. [1] |
|---|---|---|
| BOD | 140 | 37 |
| TSS | 88 | 27 |
| Ammonia (as N) | 10 | 4.9 |
| α-Terpineol | 0.033 | 0.016 |
| Benzoic acid | 0.12 | 0.071 |
| p-Cresol | 0.025 | 0.014 |
| Phenol | 0.026 | 0.015 |
| Zinc | 0.20 | 0.11 |
| pH | [2] | [2] |

[1] Milligrams per liter (mg/L, ppm)
[2] Within the range 6 to 9.

24  technology:

25  40 C.F.R. § 445.21–23.

26       51.     The General Permit requires dischargers to develop and implement a site-specific

27  SWPPP.  General Permit § X.A.  The SWPPP must include, among other elements:  (1) the

28  facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a

description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.  General Permit § X.A. The assessment of potential pollutant sources (referred to as the "pollutant source assessment") must include a narrative assessment of all areas of industrial activity, which identifies (amongst other things) any additional parameters that must be monitored in storm water outfalls due to the facility's specific industrial activities.  General Permit § X.G.2.d.

52.     Dischargers must revise their SWPPP whenever necessary and certify and submit their SWPPP via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") within 30 days whenever the SWPPP contains significant revision(s) (and, for non-significant revisions, certify and submit their SWPPP not more than once every three (3) months).  General Permit § X.B.

53.     Dischargers must implement the minimum BMPs identified in Section X.H.1. of the General Permit.  In addition to the minimum BMPs identified in Section X.H.1, advanced BMPs must be implemented to reduce or prevent discharges of pollutants in storm water dischargers in a manner that reflects best industry practice.  General Permit § X.H.2.

54.     Special Condition B requires a discharger to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of the General Permit's Receiving Water Limitations.  The documentation must describe changes the discharger will make to its current BMPs to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  General Permit § XX.B.

55.     Section XV of the General Permit requires an annual evaluation of storm water controls, including the preparation of an evaluation report, and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities within 90 days of the annual evaluation.

56.     The General Permit requires dischargers to implement a Monitoring

Implementation Plan.  General Permit § X.I.  As part of their monitoring plan, dischargers must

identify all storm water discharge locations.  General Permit§ X.I.2.  Dischargers must then

conduct monthly visual observations of each drainage area, as well as visual observations during

discharge sampling events.  General Permit § XI.A.1, 2.  Dischargers must also collect and

analyze storm water samples from two storm events within the first half of each reporting year

(July 1 to December 31) and two storm events during the second half of each reporting year

(January 1 to June 30).  General Permit § XI.B.  During the wet season, dischargers must sample

and analyze for basic parameters such as pH, total suspended solids ("TSS"), oil and grease

("O&G"), certain industry-specific parameters, and any other pollutants likely to be in the storm

water discharged from the facility based on the pollutant source assessment.  General Permit

§ XI.B.6.

57.     Dischargers must submit all sampling and analytical results via SMARTS within

thirty days of obtaining all results for each sampling event.  General Permit § XI.B.11.

58.     Sampling results must be compared to the two types of Numeric Action Level

("NAL") values set forth at Table 2 of the General Permit.  General Permit § XII.  An annual

NAL exceedance occurs when the average of the results for a parameter for all samples taken

within a reporting year exceeds the annual NAL value.  General Permit § XII.A.1.  An

instantaneous NAL exceedance occurs when two or more results from samples taken for any

single parameter within a reporting year exceed the instantaneous maximum NAL value.

General Permit § XII.A.2.  If a discharger has a NAL exceedance for a parameter during a

reporting year, the discharger is assigned a "Level 1" status for that parameter, and the

discharger must comply with additional requirements set forth at Section XII.C.  The

discharger's status changes to "Level 2" status if sampling results indicate another NAL

exceedance for that parameter while the discharger is still in Level 1 status.  If a discharger

becomes Level 2 status, it must comply with the additional obligations set forth at Section XII.D.

59.     Dischargers must submit an Annual Report no later than July 15th following each

reporting year, certifying compliance with the General Permit and/or an explanation for any non-

compliance.  General Permit § XVI.

1    V.    **STATEMENT OF FACTS**

2         **a.   The Facility**

3         60.    Defendants own and operate the Facility, an approximately 340-acre landfill

4    facility located at Foot of Parr Boulevard, in Richmond, California.

5         61.    Defendants' primary industrial activities at the Facility include maintenance of a

6    closed and capped Class I Landfill; operation of a Hazardous Waste Management Facility;

7    maintenance of a Corrective Action Management Unit; operation of a Leachate Treatment Plant;

8    maintenance of a Closed Class II Municipal Solid Waste Landfill; operation of a waste transfer

9    station; operation of a composting facility; disposal and recycling of construction and demolition

10   debris; maintenance of equipment associated with all of the above industrial activities, and a

11   system of roads connecting the industrial activities above.

12        62.    Defendants conduct industrial activities and store industrial materials outside in

13   areas exposed to storm water.  For example, the area dedicated to accepting, sorting, and

14   stockpiling construction and demolition materials is uncovered and exposed to the elements.

15   Similarly, the compost operation on top of the Closed Class II Landfill is exposed to rainfall.

16        63.    The industrial activities at the Facility fall under Standard Industrial Classification

17   ("SIC") Codes 4953 ("Refuse Systems"); 5093 ("Scrap and Waste Materials (not including

18   source separated recycling"); and 2875 ("Fertilizers, Pesticides, etc.").

19        64.    The Facility collects and discharges storm water from the Facility through at least

20   nine discharge points into San Pablo Bay, San Pablo Creek, and Pond B.

21        65.    San Pablo Bay, San Pablo Creek, and Pond B are waters of the United States

22   within the meaning of the Clean Water Act.  40 C.F.R. § 120.2(3).

23        66.    The Facility has been subject to the General Permit since at least March 30, 1992,

24   when a Notice of Intent to comply with the General Permit was received by the Regional Board.

25   Most recently, Defendants updated the Notice of Intent to comply with the General Permit on or

26   about January 24, 2019.  The Facility's Waste Discharge Identification ("WDID") number is 2

27   07I005532.

28        **b.   The Facility's SWPPP**

65.     On July 1, 2015, Defendants uploaded a Storm Water Pollution Prevent Plan ("SWPPP") for the Facility dated June 30, 2015 to SMARTS.

66.     On December 31, 2018, Defendants uploaded an amended SWPPP dated December 31, 2018 to SMARTS.

67.     On October 30, 2019, Defendants uploaded an amended SWPPP dated September 30, 2019 to SMARTS.

68.     Between July 1, 2015 and December 31, 2018, no other amendments or modifications to the Facility's SWPPP were uploaded to SMARTS.

69.     Between December 31, 2018 and October 30, 2019, no other amendments or modifications to the Facility's SWPPP were uploaded to SMARTS.

70.     Between October 30, 2019 and the present, no other amendments or modifications to the Facility's SWPPP were uploaded to SMARTS.

71.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the Facility.

72.     The Facility's SWPPP does not identify nor evaluate all sources of pollutants that may affect the quality of industrial storm water discharges because the SWPPP does not identify or evaluate the spreading of the waste materials described below.  This flaw in the SWPPP undermines each section of the SWPPP because a major source of pollutants has not been factored into the Facility's storm water management.

73.     The site map does not identify the areas where waste materials have been placed throughout the Facility, despite these being locations where waste materials are directly exposed to precipitation.

74.     The pollutant source assessment fails to describe and assess a major source of potential pollutants—the areas where waste materials have been placed throughout the Facility.

75.     The lined leachate pond is not identified as a potential source of pollutants, despite the Regional Board's documentation of that pond as being an actual source of pollutants in February 2019.

76.     None of the BMPs identified in the SWPPP address the waste materials spread throughout the Facility.

77.     Defendants have failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's numerous exceedances of EPA Benchmarks across multiple parameters, described below.

### c.   The Facility's Storm Water Management Measures

78.     The Facility's exceedances of EPA Benchmarks provided below indicate that Defendants have not implemented BAT and BCT at the Facility for its discharges of TSS, Fe, N+N, P, COD, Al, Zn, and pH.

79.     Plaintiff is informed and believes, and thereupon alleges, that Defendants' storm water controls at the Facility, to the extent any exist, fail to achieve BAT and BCT standards.

80.     The management practices at the Facility are wholly inadequate to prevent the sources of contamination described below from causing the discharge of pollutants to waters of the United States.

81.     Since at least 2011, Defendants have placed waste materials on the exterior portion of the closed landfill cells at the Facility.

82.     These materials include waste from the Facility's composting operation on the closed Class II landfill, and potentially other contaminants or pollutants not documented or assessed.

83.     Publicly available satellite imagery, Attachment A to **Exhibit A**, shows that Defendants placed this waste material throughout the Facility, beyond permitted operational waste boundaries.

84.     The waste materials were often placed in windrows or piles, which were then spread across the ground, covering a large percentage of the Facility's surface.

85.     Storm water that falls on the Facility becomes contaminated by the waste material (thus becoming "contaminated storm water" as defined by 40 C.F.R. § 445.2(b)) and commingles with the Facility's storm water.

### d.   The Facility's Monitoring Program

86.     Defendants have failed to develop and implement adequate storm water monitoring, reporting, and sampling programs at the Facility.

87.     Defendants have failed to monitor all of the storm water outfalls at the Facility, as required by the General Permit.

88.     Defendants have not collected samples from all discharge points during each sampling event because Defendants have failed to collect samples of discharges going into Pond B and have failed to collect samples of discharges from each perimeter discharge location at the Facility.

89.     Defendants did not collect the required number of samples during the 2017/2018, 2018/2019, and 2019/2020 reporting periods.

90.     Defendants failed to analyze all samples of storm water for all required parameters, including any unknown parameters that could only be determined by performing an adequate pollutant source assessment.

91.     Defendants failed to analyze all samples of storm water for all of the required parameters related to the ELGs pursuant to 40 C.F.R. §§ 445.21–23.

92.     Defendants improperly composite and combine samples of storm water by combining samples from separate drainage areas into one reported sample.

                    **e.    The Facility's Discharges of Pollutants**

93.     Under the General Permit, Defendants have sampled storm water discharges from the Facility and found levels of pollutants in the samples that exceeded EPA's benchmarks.  This information was reported to the Regional Board, as required by the General Permit.

94.     According to Defendants' self-monitoring reports submitted to the Regional Board, Defendants have measured discharges containing levels of TSS, Fe, N+N, P, COD, Al, Zn, and pH in excess of the EPA Benchmark Values on at least one hundred forty-nine (149) occasions since August 24, 2015.

95.     Self-monitoring reports filed pursuant to an NPDES permit that report exceedances of permit limitations constitute "conclusive evidence" of violations of the permit and the Act.  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), *rev'd on other*

*grounds*, 485 U.S. 931 (1988), *amended by* 853 F.2d 667 (9th Cir. 1988).

96.     Plaintiff is informed and believes, and thereupon alleges, that since at least August 24, 2015, Defendants have consistently discharged from their Facility storm water and non-storm water containing impermissible levels of TSS, Fe , N+N, P, COD, Al, Zn, and pH and other pollutants associated with Defendants' industrial operations into the Impacted Waters, without complying with the terms of the General Permit.

97.     According to Defendants' self-monitoring reports, since at least August 24, 2015, Defendants have known that storm water discharged from the Facility contains concentrations of: TSS in excess of EPA Benchmark Value of 100 mg/L; Fe in excess of EPA Benchmark Value of 1.00 mg/L; N+N in excess of EPA Benchmark Value of 0.68 mg/L; P in excess of EPA Benchmark Value of 2.0 mg/L; COD in excess of EPA Benchmark Value of 120 mg/L; Al in excess of EPA Benchmark Value of 0.75 mg/L; Zn in excess of EPA Benchmark Value of 0.26 mg/L; and pH in excess of EPA Benchmark Value of 9 s.u.

98.     On at least thirteen (13) documented occasions since August 24, 2015, the levels of TSS detected by Defendants in the storm water discharged from its Facility exceeded the Benchmark Value of 100 mg/L for TSS.

99.     On at least nineteen (19) documented occasions since August 24, 2015, the levels of Fe detected by Defendants in the storm water discharged from its Facility exceeded the Benchmark Value of 1.00 mg/L.

100.     On at least thirty-six (36) documented occasions since August 24, 2015, the levels of N+N detected by Defendants in the storm water discharged from its Facility exceeded the Benchmark Value of 0.68 mg/L for N+N.

101.     On at least eleven (11) documented occasions since August 24, 2015, the levels of P detected by Defendants in the storm water discharged from its Facility exceeded the Benchmark Value of 2.0 mg/L for P.

102.     On at least thirty-two (32) documented occasions since August 24, 2015, the levels of COD detected by Defendants in the storm water discharged from its Facility exceeded the Benchmark Value of 120 mg/L for COD.

103.    On at least nineteen (19) documented occasions since August 24, 2015, the levels of Al detected by Defendants in the storm water discharged from its Facility exceeded the Benchmark Value of 0.75 mg/L for Al.

104.    On at least four (4) documented occasions since August 24, 2015, the levels of Zn detected by Defendants in the storm water discharged from its Facility exceeded the Benchmark Value of 0.26 mg/L for Zn.

105.    On at least thirteen (13) documented occasions since August 24, 2015, the levels of pH detected by Defendants in the storm water discharged from its Facility exceeded the Benchmark Value of 9 s.u. for pH.

106.    Defendants' discharges of contaminated storm water exceed the storm water ELGs set forth at 40 C.F.R. §§ 445.21-23 and in violation of General Permit Section V.B.

107.    On at least thirteen (13) documented occasions since August 24, 2015, the levels of TSS detected by Defendants in the contaminated storm water discharged from its Facility exceeded the maximum daily ELG of 88 mg/L for TSS.

108.    On at least four (4) documented occasions since August 24, 2015, the levels of Zn detected by Defendants in the contaminated storm water discharged from its Facility exceeded the maximum daily ELG of 0.11 mg/L for Zn.

109.    On at least twelve (12) documented occasions since August 24, 2015, the levels of pH detected by Defendants in the contaminated storm water discharged from its Facility exceeded the maximum daily ELG of 9 s.u. for pH.

110.    During at least ten (10) months since August 24, 2015, the levels of TSS detected by Defendants in the contaminated storm water discharged from its Facility exceeded the maximum monthly average ELG of 27 mg/L for TSS.

111.    During at least two (2) months since August 24, 2015, the levels of Zn detected by Defendants in the contaminated storm water discharged from its Facility exceeded the maximum monthly average ELG of 0.2 mg/L for Zn.

112.    During at least three (3) months since August 24, 2015, the levels of pH detected by Defendants in the contaminated storm water discharged from its Facility exceeded the

maximum monthly average ELG of 9 s.u. for pH.

113.   Each of the discharges in exceedance of the ELGs identified above is a separate violation of General Permit Section V.B.

114.   As a result of inadequate storm water management practices, storm water associated with industrial activities containing pollutants harmful to fish, plant and bird life, and human health are being discharged from the Facility directly to the Impacted Waters during significant rain events.

115.   The Facility has discharged, and will discharge again, landfill waste water (e.g., leachate and contaminated storm water), to Pond B, a water of the United States.

**f.   Defendants' Exceedance Response Actions**

116.   On July 1, 2016, Defendants entered into "Level 1" status for Al, Fe, COD, and N+N because sample results for each parameter exceeded annual NALs for the 2015-2016 reporting year.

117.   On December 30, 2016, Defendants submitted a "Level 1" ERA Report to SMARTS.

118.   The December 30, 2016 "Level 1" ERA Report failed to identify or evaluate the waste materials spread throughout the Facility as a potential source of pollutants, and the "Level 1" ERA Report failed to identify or evaluate any new or existing BMPs which would address this source of pollutants.

119.   On July 1, 2017, Defendants entered into "Level 2" status for Al, Fe, COD, and N+N because sample results for each parameter exceeded annual NALs for the 2015-2016 and 2016-2017 reporting years.

120.   On December 21, 2017, Defendants submitted a "Level 2" ERA Action Plan to SMARTS.

121.   The December 21, 2017 "Level 2" ERA Action Plan did not identify nor evaluate the waste materials spread throughout the Facility as a potential source of pollutants, and the Action Plan did not identify or evaluate any new or existing BMPs which would address this source of pollutants.

122.    On June 30, 2019, Defendants submitted a "Level 2" ERA Technical Report to SMARTS.

123.    The June 30, 2019 "Level 2" ERA Technical Report included an Industrial Activity BMP Demonstration; however, the Demonstration failed to describe or evaluate a major source of pollutants—the waste materials spread throughout the Facility.

124.    On July 1, 2019, Defendants entered into "Level 1" for TSS and pH because sample results for each parameter exceeded annual NALs for the 2018-2019 reporting year.

125.    Defendants elected to skip the "Level 1" ERA Evaluation and Report for TSS and pH and on December 27, 2019, Defendants submitted a "Level 2" ERA Action Plan to SMARTS for TSS and pH.

126.    The December 27, 2019 "Level 2" ERA Action Plan failed to identify or evaluate the waste materials spread throughout the Facility as a potential source of pollutants, and it did not identify or evaluate any new or existing BMPs which would address this source of pollutants.

127.    Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Failure to Develop and Implement an Adequate
Storm Water Pollution Prevention Plan For the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

128.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

129.    Section X of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP prior to commencement of industrial activities.

130.    Defendants have failed to develop and implement an adequate SWPPP for the Facility. Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendants' outdoor storage of industrial materials without

appropriate best management practices; the failure to identify all discharge locations and drainage areas; the lack of specificity and detail required by the General Permit; the failure to include a compliant site map; the failure to keep the SWPPP updated; the continued exposure of significant quantities of industrial materials to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable standards.

131.    The Facility's SWPPP does not identify or evaluate all sources of pollutants that may affect the quality of industrial storm water discharges because the SWPPP does not identify or evaluate the spreading of the waste materials throughout the Facility.  This flaw in the SWPPP undermines each section of the SWPPP because a major source of pollutants has not been factored into the Facility's storm water management.

132.    The site map does not identify the areas where waste materials have been placed throughout the Facility, despite these being locations where materials are directly exposed to precipitation, in violation of General Permit Section X.E.3.e.

133.    The pollutant source assessment is deficient because it fails to describe and assess a major source of potential pollutants—the areas where waste materials have been placed throughout the Facility—in violation of General Permit Section X.G.

134.    The lined leachate pond is not identified as a potential source of pollutants, despite the Regional Board's documentation of that pond as being an actual source of pollutants in February 2019, in violation of General Permit Section X.G.

135.    None of the BMPs identified in the SWPPP address the waste materials spread throughout the Facility in violation of General Permit Section X.H.

136.    Defendants have further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit in violation of General Permit Sections X.B.1 and X.C.1.b.

137.    Defendants continue to violate the Act each day that they fail to develop and fully implement an adequate SWPPP for the Facility.  These violations are ongoing and continuous.

138.    Each day that Defendants have failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since August 24, 2015.  *See* 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

## SECOND CLAIM FOR RELIEF

**Failure to Develop and Implement the Best Available
And Best Conventional Treatment Technologies at the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

139.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

140.    The General Permit's SWPPP requirements and Section V.A. require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

141.    To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges.  *See* General Permit, §§ X.H.1–2.

142.    Defendants have failed to implement BAT and BCT at the Facility for its discharges of TSS, Fe , N+N, P, COD, Al, Zn and pH in violation of Section V.A. of the General Permit.

143.    Defendants have failed to implement the minimum BMPs required by the General Permit, including: good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping.  General Permit §§ X.H.1(a)–(g).

144.    Defendants have further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards,

including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitation guidelines.  General Permit § X.H.2.

145.    Defendants' ongoing failure to develop and implement BAT and BCT at the Facility is evidenced by, *inter alia*, Defendants' chronic and gross exceedances of EPA benchmarks, Defendants' deficient SWPPP and poor housekeeping, and Defendants' failure to identify and assess a major source of pollutants at the Facility—the waste materials spread throughout the Facility.

146.    Each day that Defendants have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

147.    Defendants continue to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement BMPs meeting the BAT and BCT standards. These violations are ongoing and continuous.

148.    Defendants have been in violation of the BAT and BCT requirements at the Facility every day since at least August 24, 2015.  Defendants are subject to civil penalties for each and every violation of the Act since August 24, 2015.  *See* 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

## THIRD CLAIM FOR RELIEF

**Failure to Develop and Implement an Adequate
Monitoring Implementation Plan for the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

149.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

150.    Sections X.I and XI of the General Permit require dischargers of storm water associated with industrial activity to develop and implement a monitoring implementation plan (including, among other things, sampling and analysis of discharges) prior to commencement of industrial activities.

151.    Defendants have failed to develop and implement an adequate monitoring implementation plan for the Facility.  Defendants' ongoing failure to develop and implement adequate monitoring and reporting programs is evidenced by, *inter alia*, their continuing failure to collect and analyze storm water samples from all discharge locations and their continuing failure to analyze storm water samples for pollutants likely to be present in the Facility's storm water discharges in significant quantities and other pollutants as the General Permit requires.

152.    Defendants' failure to designate every storm water discharge point from the Facility is a violation of General Permit Section XI.B.4.

153.    Defendants' failure to collect samples from every storm water discharge point from the Facility is a violation of General Permit Section XI.B.4.

154.    Defendants did not collect the required number of samples during the 2017/2018, 2018/2019, and 2019/2020 reporting periods in violation of Section XI.B.2 of the General Permit.

155.    Defendants failed to analyze all samples of storm water for all required parameters, including any unknown parameters that could only be determined by performing an adequate pollutant source assessment, in violation of Section XI.B.6.c.

156.    Defendants failed to analyze all samples of storm water for all of the required parameters related to the ELGs pursuant to 40 C.F.R. §§ 445.21-23, in violation of Section XI.B.6.g.

157.    Defendants improperly composite and combine samples of storm water by combining samples from separate drainage areas into one reported sample, in violation of Section XI.B.4.

158.    Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility each day since at least August 24, 2015.  These violations are ongoing and continuous.

159.     Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since August 24, 2015.  *See* 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R.

§ 19.4.

## FOURTH CLAIM FOR RELIEF

**Discharges of Contaminated Storm Water From The Facility
in Violation of the Permit's Water Quality-Based Conditions and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

160.    Plaintiff incorporates the allegations contained in the above paragraphs as though
fully set forth herein.

161.    Sections VI.A and VI.B of the General Permit require that storm water discharges
and authorized non-storm water discharges shall not adversely impact human health or the
environment, and shall not cause or contribute to a violation of any water quality standards in any
affected receiving water.  Section III.C of the General Permit requires that storm water discharges
and authorized non-storm water discharges shall not cause or threaten to cause pollution,
contamination, or nuisance.

162.    Plaintiff is informed and believes, and thereupon alleges, that since at least August
24, 2015, Defendants have been discharging polluted storm water from the Facility into the
Impacted Waters, in violation of the General Permit's water quality-based conditions.

163.    During every significant rain event, storm water flowing over and through materials
at the Facility becomes contaminated with pollutants, flowing untreated or insufficiently treated
from the Facility to the Impacted Waters.

164.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of
contaminated storm water are causing pollution and contamination of waters of the United States
in violation of Section III.C of the General Permit.

165.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of
contaminated storm water are adversely affecting human health and the environment in violation
of Sections VI.A and VI.B of the General Permit.

166.    Defendants' discharges adversely affect human health or the environment in
violation of Section VI.B of the General Permit.  The Facility's storm water sample results

demonstrate that Defendants' discharges cause or contribute to violations of the Basin Plan's discharge prohibitions and water quality standards discussed above in violation of Section VI.A of the General Permit.  Specifically, Defendants' discharges cause or contribute to violations of the Basin Plan's prohibition against discharging solid waste to surface waters or at any place where they would contact or be eventually transported to surface waters by placing waste materials associated with the composting operation throughout the Facility.

167.   Exceedances of pollutants measured in Defendants' discharges cause or contribute to violations of the Basin Plan's narrative water quality standards for Floating Materials, Section 3.3.6, and Settleable Materials, Section 3.3.13.

168.   Plaintiff is informed and believes, and thereupon alleges, that on every day with significant rainfall since August 24, 2015, Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit.  These violations are ongoing and continuous.

169.   Every day Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since August 24, 2015.  *See* 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

## FIFTH CLAIM FOR RELIEF

**Failure to Complete Adequate Exceedance Response Actions at the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

170.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

171.   Section XII of the General Permit requires Dischargers to take certain action in response to exceedances of the NALs.

172.   Defendants have failed to complete the required "Level 1" and "Level 2" exceedance response actions triggered by the reported exceedances of Al, Fe, COD, N+N, TSS, and pH.

173.    Defendants' December 30, 2016 "Level 1" ERA Report's summary of the "Level 1" ERA Evaluation revealed a deficient evaluation because Defendants failed to adequately evaluate the waste materials spread throughout the Facility as potential source of pollutants, in violation of Section XII.C.1.b of the General Permit.

174.    Each day Defendants failed to properly complete a "Level 1" ERA Evaluation is a violation of the General Permit, Section XII.C.1.

175.    Defendants have been in violation of Section XII.C.1. every day since October 1, 2016.

176.    Defendants violated Section XII.D.2 of the General Permit because the June 30, 2019 "Level 2" ERA Technical Report failed to describe or evaluate a major source of pollutants—the waste materials spread throughout the Facility.

177.    Each day Defendants failed to properly complete a "Level 2" ERA Technical Report is a violation of the General Permit, Section XII.D.2.

178.    Defendants have violated Section XII.D.2 every day since July 1, 2019.

179.    Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since August 24, 2015.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

## VII.    RELIEF REQUESTED

Wherefore, CSPA respectfully requests that this Court grant the following relief:

a.    Declare Defendants to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from the Facility not in compliance with a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342, and for failing to comply with all substantive and procedural requirements of the General Permit and the Clean Water Act as alleged herein;

b.    Enjoin Defendants from discharging pollutants from the Facility and to the surface waters surrounding and downstream from the Facility in violation of the General Permit and the Clean Water Act;

c.      Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit and the Clean Water Act;

d.      Order Defendants to pay civil penalties of $37,500 per day per violation for all violations occurring after August 24, 2015 and $55,800 per day per violation for all violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. §§ 19.1–19.4;

e.      Order Defendants to take appropriate actions to restore the quality of navigable waters impaired by their activities;

f.      Award Plaintiff's costs and fees (including reasonable attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

g.      Award any such other and further relief as this Court may deem appropriate.


Dated: November 3, 2020                    Respectfully Submitted,

LAW OFFICES OF ANDREW L. PACKARD

By: /s/ William N. Carlon

William N. Carlon
Attorney for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

# EXHIBIT A

Law Offices Of

A N D R E W   L.   P A C K A R D

245 Kentucky Street, Suite B3, Petaluma, CA 94952
Phone (707) 782-4060   Fax (707) 782-4062
Info@PackardLawOffices.com

August 24, 2020

**VIA CERTIFIED MAIL**

Rob Sherman, General Manager
West Contra Costa Sanitary Landfill, Inc.
PO Box 4100
Richmond, CA 94804

Ed Baquerizo, Environmental Manager
West Contra Costa Sanitary Landfill, Inc.
PO Box 4100
Richmond, CA 94804

CT Corporation System, Agent for Service
of Process for West Contra Costa Sanitary
Landfill, Inc.
818 West Seventh Street, Suite 930
Los Angeles, CA 90017

Robert B. Boyer, Chief Executive Officer
West Contra Costa Sanitary Landfill, Inc.
18500 North Allied Way
Phoenix, AZ 85054

Re:     **NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE
        FEDERAL WATER POLLUTION CONTROL ACT ("CLEAN WATER ACT")
        (33 U.S.C. §§ 1251 *et seq.*)**

Dear Rob Sherman, Ed Baquerizo, and Robert Boyer:

        This firm represents California Sportfishing Protection Alliance ("CSPA") in regard to
violations of the Clean Water Act ("the Act") occurring at West Contra Costa Sanitary Landfill
located at Foot of Parr Boulevard, in Richmond, California (the "Facility").  This letter is being
sent to you as the responsible owners, officers and/or operators of the Facility, or as the
registered agent for this entity.  Unless otherwise noted, West Contra Costa Sanitary Landfill,
Inc., Rob Sherman, Ed Baquerizo, and Robert Boyer shall hereinafter be collectively referred to
as "WCCSL."

        WCCSL is in ongoing violation of the substantive and procedural requirements of the
Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and National Pollutant Discharge Elimination System
("NPDES") General Permit No. CAS000001 State Water Resources Control Board Water
Quality Order No. 14-57-DWQ ("General Permit" or "Permit").[1]  The purpose of this letter is to
provide WCCSL with notice of the violations of the General Permit occurring at the Facility,
including, but not limited to, discharges of polluted storm water associated with industrial
activities from the Facility into local surface waters.

_____

[1] WCCSL submitted a Notice of Intent ("NOI") to comply with the General Permit for the
Facility on or about January 24, 2019.  The Facility's Waste Discharge Identification number is
207I005532.

Notice of Violation and Intent To File Suit
August 24, 2020
Page 2

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Act subjects WCCSL to a penalty for all violations occurring during the period commencing five years prior to the date of the Notice Letter.  These provisions of law authorize civil penalties of up to $37,500 per day per violation for all Clean Water Act violations occurring after January 12, 2009, and $55,800 per day per violation for all violations that occurred after November 2, 2015. In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

The Clean Water Act requires that sixty (60) days prior to the initiation of a citizen-enforcement action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen enforcer must give notice of its intent to file suit.  Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the Chief Administrative Officer of the water pollution control agency for the State in which the violations occur.  *See* 40 C.F.R. § 135.2.  As required by the Act, this letter provides statutory notice of the violations that have occurred, and continue to occur, at the Facility.  40 C.F.R. § 135.3(a).  At the expiration of sixty (60) days from the date of this letter, CSPA intends to file suit under Section 505(a) of the Act in federal court against WCCSL for violations of the Clean Water Act and the Permit.

**I.      Background**

**A.      California Sportfishing Protection Alliance**

CSPA is a non-profit corporation dedicated to the preservation, protection and defense of the environment, wildlife and natural resources of California waters, including the waters into which WCCSL discharges polluted storm water.  Members of CSPA enjoy the waters that the Facility discharges into, including San Pablo Bay.  Members of CSPA use and enjoy these waters for their fishing, estuarine habitat and the rare, threatened and endangered species it supports, the wildlife habitat, marine habitat, and other designated beneficial uses.  The discharge of pollutants from the Facility impairs each of these uses.  Discharges of polluted storm water from the Facility are ongoing and continuous.  Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by WCCSL' failure to comply with the Clean Water Act and the General Permit.

**B.      The Clean Water Act**

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251.  The Act prohibits the discharge of pollutants into United States waters except as authorized by the statute.  33 U.S.C. § 1311; *San Francisco Baykeeper, Inc. v. Tosco Corp*., 309 F.3d 1153, 1156 (9th Cir. 2002).  The Act is administered largely through the NPDES permit program.  33 U.S.C. § 1342. In 1987, the Act was amended to establish a framework for regulating storm water discharges through the NPDES system.  Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832,

Notice of Violation and Intent To File Suit
August 24, 2020
Page 3

840-41 (9th Cir. 2003) (describing the problem of storm water runoff and summarizing the Clean Water Act's permitting scheme).  The discharge of pollutants without an NPDES permit, or in violation of a permit, is illegal.  *Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been delegated to the states.  *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program).  The CWA authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).  Pursuant to Section 402 of the Act, the Administrator of EPA has authorized California's State Board to issue individual and general NPDES permits in California.  33 U.S.C. § 1342.

C.     **California's General Permit for Storm Water Discharges Associated with Industrial Activities**

Facilities discharging, or having the potential to discharge, storm water associated with industrial activities that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent to Comply ("NOI").  General Permit, Standard Condition XXI.A.  Facilities must file their NOIs before the initiation of industrial operations.  *Id.*  Facilities must strictly comply with all of the terms and conditions of the General Permit; a violation of the General Permit is a violation of the CWA.

The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, effluent limitations, and receiving water limitations; (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and (3) self-monitoring and reporting requirements.

D.     **WCCSL's Facility**

Information available to CSPA indicates that WCCSL's industrial activities at the approximately 340-acre Facility include, but are not limited to: maintenance of a closed and capped Class I Landfill; operation of a Hazardous Waste Management Facility; maintenance of a Corrective Action Management Unit; operation of a Leachate Treatment Plant; maintenance of a Closed Class II Municipal Solid Waste Landfill; operation of a waste transfer station; operation of a composting facility; disposal of construction and demolition debris; and maintenance of equipment associated with all of the above industrial activities (collectively "Industrial Activities").  The Industrial Activities at the Facility fall under Standard Industrial Classification ("SIC") Codes 4953 ("Refuse Systems"); 5093 ("Scrap and Waste Materials (not including source separated recycling)"); and, 2875 ("Fertilizers, Pesticides, etc.").

WCCSL collects and discharges storm water associated with its Industrial Activities at the Facility through at least nine discharge points into San Pablo Bay, San Pablo Creek, and a

Notice of Violation and Intent To File Suit
August 24, 2020
Page 4

large lagoon south of the Facility ("Pond B").  San Pablo Bay, San Pablo Creek, and Pond B are
waters of the United States within the meaning of the Clean Water Act.  40 C.F.R. § 120.2(3).

The areas of Industrial Activity at the Facility are sources of pollutants, as are wastes
placed on slopes outside of permitted areas on the closed Class II portion of the landfill property.
The General Permit requires WCCSL to analyze storm water samples for TSS, pH, and Oil and
Grease.  General Permit, Section XI.B.6.  Facilities under SIC Code 4953 must also analyze
storm water samples for iron ("Fe"), lead ("Pb"), aluminum ("Al"), zinc ("Zn"), chemical
oxygen demand ("COD"), nitrate plus nitrite nitrogen ("N+N"), and phosphorus ("P").  General
Permit, Tables 1-2.

## II.     WCCSL's Violations of the Act and Permit

Based on its review of available public documents, CSPA is informed and believes that
WCCSL is in ongoing violation of both the substantive and procedural requirements of the CWA
and the General Permit.  These violations are ongoing and continuous.  Consistent with the five-
year statute of limitations applicable to citizen enforcement actions brought pursuant to the
federal Clean Water Act, WCCSL is subject to penalties for violations of the Act since August
21, 2015.

### A.     WCCSL Discharges Storm Water Containing Pollutants in Violation of the
General Permit's Discharge Prohibitions, Effluent Limitations, and
Receiving Water Limitations

WCCSL's storm water sampling results provide conclusive evidence of WCCSL's failure
to comply with the General Permit's discharge prohibitions, effluent limitations, and receiving
water limitations.  Self-monitoring reports under the Permit are deemed "conclusive evidence of
an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir.
1988).

#### 1.     Discharge Prohibitions

The General Permit prohibits all discharges of storm water to waters of the United States
except as specifically authorized by the General Permit or another NPDES permit.  General
Permit, Section III.A.  The General Permit further prohibits, with a few authorized exceptions,
the discharge of liquids or materials other than storm water to waters of the United States unless
authorized by another NPDES permit.  General Permit, Section III.B.

The General Permit requires that storm water discharges and authorized non-storm water
discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  General
Permit, Discharge Prohibition III.C.  The General Permit also prohibits discharges that violate
any discharge prohibition contained in the applicable Regional Water Board's Basin Plan or
statewide water quality control plans and policies.  General Permit, Discharge Prohibition III.D.

Notice of Violation and Intent To File Suit
August 24, 2020
Page 5

## 2.    Effluent Limitations

Dischargers are required to reduce or prevent pollutants in their storm water discharges through implementation of best available technology economically achievable ("BAT") for toxic and nonconventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants.  General Permit, Effluent Limitation V.A.  Conventional pollutants include Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand and Fecal Coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  40 C.F.R. §§ 401.15-16.

Under the General Permit, benchmark levels established by the EPA ("EPA benchmarks") serve as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  *Santa Monica Baykeeper v. Kramer Metals,* 619 F. Supp. 2d 914, 920, 923 (C.D. Cal 2009); General Permit, Section XII.A.  The following EPA benchmarks have been established for pollutants discharged by WCCSL: total suspended solids – 100 mg/L; oil & grease – 15.0 mg/L; iron – 1.0 mg/L; aluminum – 0.75 mg/L; zinc – 0.26 mg/L; chemical oxygen demand – 120 mg/L; nitrate plus nitrite nitrogen – 0.68 mg/L; phosphorus – 2.0 mg/L; and, pH – 6.0-9.0 s.u.

The General Permit also incorporates Effluent Limitation Guidelines ("ELG") for industrial storm water discharges from facilities in specific industrial categories.  General Permit, Section I.K.  WCCSL's Facility is a landfill and therefore subject to the storm water ELGs identified in Attachment F of the General Permit.  General Permit, Section V.B.  40 C.F.R. § 445.2(b) defines "contaminated storm water" as "storm water which comes in direct contact with landfill wastes, the waste handling and treatment areas, or landfill wastewater as defined in paragraph (f) of this section."  "Contaminated storm water" is included in the definition of "landfill wastewater."  40 C.F.R. § 445.2(f).  Landfills that discharge "contaminated storm water" must achieve the following effluent limitations which represent the application of best practicable control technology currently available and the best conventional pollutant control technology:

### EFFLUENT LIMITATIONS

| Regulated parameter | Maximum daily [1] | Maximum monthly avg. [1] |
|---|---|---|
| BOD | 140 | 37 |
| TSS | 88 | 27 |
| Ammonia (as N) | 10 | 4.9 |
| α-Terpineol | 0.033 | 0.016 |
| Benzoic acid | 0.12 | 0.071 |
| p-Cresol | 0.025 | 0.014 |
| Phenol | 0.026 | 0.015 |
| Zinc | 0.20 | 0.11 |
| pH | ([2]) | ([2]) |

[1] Milligrams per liter (mg/L, ppm)
[2] Within the range 6 to 9.

Notice of Violation and Intent To File Suit
August 24, 2020
Page 6

40 C.F.R. §§ 445.21-23.

Information available to CSPA indicates that WCCSL has discharged, and continues to discharge, "contaminated storm water" – and thus "landfill wastewater" – from the Facility on each day storm water discharges from the Facility, since at least 2011.  WCCSL, between 2011 and the present, has placed waste materials on the exterior portions of the closed landfill cells at the Facility.  These materials include waste from the Facility's composting operation on the closed Class II landfill, and potentially other contaminants or pollutants not documented or assessed.  Publicly-available satellite imagery shows that WCCSL placed this waste material throughout the Facility, beyond permitted operational waste boundaries.  *See* **Attachment A**. The waste materials were often placed in windrows or piles, which were then spread across the ground, covering a large percentage of the Facility's surface.  *Id.*  Storm water that falls on the Facility becomes contaminated by the waste material (thus becoming "contaminated storm water" as defined by 40 C.F.R. § 445.2(b)) and commingles with the Facility's storm water which discharges directly to San Pablo Bay in the northern portion of the Facility, to San Pablo Creek in the eastern portion of the Facility and to the unlined Pond B in the southern portion of the Facility.

WCCSL's discharges of "contaminated storm water" must not exceed the storm water ELGs identified at 40 C.F.R. §§ 445.21-23.  General Permit, Section V.B.  The following discharges of "contaminated storm water" from the Facility have violated the ELGs imposed by Section V.B of the General Permit:

| Date | Sample Name | Parameter | Sample Result | ELG |
|------|-------------|-----------|---------------|-----|
| 1/17/2020 | WCL-08 | TSS | 2600 mg/L | 88 mg/L* |
| 1/17/2020 | WCL-08 | Zn | 0.7 mg/L | 0.2 mg/L* |
| January 2020 | | TSS | 338 mg/L | 27 mg/L** |
| 12/18/2019 | WCL-08 | TSS | 290 mg/L | 88 mg/L* |
| December 2019 | | TSS | 55 mg/L | 27 mg/L** |
| 3/20/2019 | WCL-08 | TSS | 210 mg/L | 88 mg/L* |
| 3/20/2019 | WCL-08 | pH | 9.4 s.u. | 6 – 9 s.u.* |
| 3/20/2019 | WCL-11-E | pH | 9.5 s.u. | 6 – 9 s.u.* |
| March 2019 | | TSS | 116 mg/L | 27 mg/L** |
| March 2019 | | pH | 9.45 s.u. | 6 – 9 s.u.** |
| 2/26/2019 | WCL-11-E | TSS | 300 mg/L | 88 mg/L* |
| 2/26/2019 | WCL-11-E | pH | 9.5 s.u. | 6 – 9 s.u.* |
| 2/13/2019 | WCL-08 | TSS | 640 mg/L | 88 mg/L* |
| 2/13/2019 | WCL-08 | pH | 9.1 s.u. | 6 – 9 s.u.* |
| 2/13/2019 | WCL-11-E | pH | 9.4 s.u. | 6 – 9 s.u.* |
| 2/5/2019 | WCL-08 | pH | 9.4 s.u. | 6 – 9 s.u.* |
| 2/5/2019 | WCL-11-E | pH | 9.1 s.u. | 6 – 9 s.u.* |
| February 2019 | | TSS | 176 mg/L | 27 mg/L** |
| February 2019 | | pH | 9.23 s.u. | 6 – 9 s.u.** |
| 11/29/2018 | WCL-08 | TSS | 510 mg/L | 88 mg/L* |

Notice of Violation and Intent To File Suit
August 24, 2020
Page 7

| 11/29/2018 | WCL-08 | Zn | 0.23 mg/L | 0.2 mg/L* |
| November 2018 | | TSS | 258 mg/L | 27 mg/L** |
| November 2018 | | Zn | 0.12 mg/L | 0.11 mg/L** |
| 1/22/2018 | WCL-08 | pH | 9.3 s.u. | 6 – 9 s.u.* |
| 1/8/2018 | WCL-08 | pH | 9.6 s.u. | 6 – 9 s.u.* |
| 1/8/2018 | WCL-08 | TSS | 1200 mg/L | 88 mg/L* |
| 1/8/2018 | WCL-08 | Zn | 0.38 mg/L | 0.2 mg/L* |
| January 2018 | | TSS | 322 mg/L | 27 mg/L** |
| January 2018 | | Zn | 0.12 mg/L | 0.11 mg/L** |
| 2/20/2017 | WCL-11-C | pH | 9.4 s.u. | 6 – 9 s.u. |
| 2/20/2017 | WCL-11-D | pH | 9.1 s.u. | 6 – 9 s.u.* |
| February 2017 | | pH | 9.25 s.u. | 6 – 9 s.u.** |
| 12/8/2016 | WCL-08 | TSS | 160 mg/L | 88 mg/L* |
| December 2016 | | TSS | 160 mg/L | 27 mg/L** |
| 3/7/2016 | WCL-08 | TSS | 302 mg/L | 88 mg/L* |
| March 2016 | | TSS | 302 mg/L | 27 mg/L** |
| 1/6/2016 | WCL-11-E | TSS | 1200 mg/L | 88 mg/L* |
| 1/6/2016 | WCL-08 | TSS | 200 mg/L | 88 mg/L* |
| 1/6/2016 | WCL-11-E | Zn | 0.22 mg/L | 0.2 mg/L* |
| January 2016 | | TSS | 487 mg/L | 27 mg/L** |
| 12/13/2015 | WCL-08 | pH | 9.3 s.u. | 6 – 9 s.u.* |
| 12/13/2015 | WCL-08 | TSS | 420 mg/L | 88 mg/L* |
| 12/13/2015 | WCL-11-D | TSS | 150 mg/L | 88 mg/L* |
| December 2015 | | TSS | 197 mg/L | 27 mg/L** |

*maximum daily effluent limitation
**maximum monthly average effluent limitation

On February 5 and 15, 2019, Regional Water Quality Control Board staff inspected the Facility and observed violations of the General Permit, and the Facility's Waste Discharge Requirement Order No. R2-2002-0066. The Regional Board staff received a report from a Contra Costa County Department of Environmental Health inspector who observed the Facility pumping "contaminated storm water" from the lined leachate pond ("Lined Pond") to the unlined stormwater pond in Area A ("Pond A"). The Regional Board reported that Facility staff stated that "contaminated storm water" from the compost operation and runoff was released into the Pond A. Regional Board staff observed Pond A overflowing into the unlined Pond B (a water of the United States).

Information available to CSPA indicates that the Lined Pond is undersized for its purpose of capturing the "contaminated storm water" generated at the compost operation, and any other runoff that drains to the Lined Pond. CSPA is informed and believes that during periods of significant rainfall the Lined Pond is likely to overflow into the unlined Pond A and the unlined Pond B. Each day the Facility has discharged, or discharges, storm water from the Lined Pond is a violation of Section III.A of the General Permit because discharges of the "contaminated storm

Notice of Violation and Intent To File Suit
August 24, 2020
Page 8

water" collected in the Lined Pond are not authorized under the General Permit. WCCSL has also violated, and continues to violate, Section V of the General Permit by failing to adequately monitor any discharges from the Lined Pond, or any waters that have commingled with "contaminated storm water" from the Lined Pond because those discharges are subject to the storm water ELGs at 40 C.F.R. §§ 445.21-23.

### 3. Receiving Water Limitations

Storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water. General Permit, Sections VI.A, VI.B. Industrial storm water discharges shall not contain pollutants in quantities that threaten to cause pollution or a public nuisance. General Permit, Section VI.C.

Dischargers are required to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of the General Permit's Receiving Water Limitations. General Permit, Section XX.B. The documentation must describe changes the discharger will make to its current storm water Best Management Practices ("BMPs") in order to prevent or reduce the presence of any pollutants in its storm water discharges that are causing or contributing to an exceedance of water quality standards. *Id.*

The *San Francisco Bay Basin (Region 2) Water Quality Control Plan (Basin Plan)*, amended May 4, 2017, ("Basin Plan") also sets forth water quality standards and prohibitions applicable to WCCSL's storm water discharges. The Basin Plan prohibits the discharge of "[r]ubbish, refuse, bark, sawdust, or other solid wastes into surface waters or at any place where they would contact or where they would be eventually transported to surface waters, including flood plain areas." Basin Plan, Table 4-1. The following narrative standards also apply: "[w]aters shall not contain floating material, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses;" "[w]aters shall not contain substances in concentrations that result in the deposition of material that cause nuisance or adversely affect beneficial uses." Basin Plan, Section 3.3.6 and 3.3.13. The Basin Plan identifies present and potential beneficial uses for the San Pablo Bay, which include industrial service water supply, commercial and sportfishing, shellfish harvesting, estuarine habitat, fish migration, preservation of rare and endangered species, fish spawning, wildlife habitat, contact and noncontact water recreation, and navigation. The 2014/2016 California Integrated Report (Clean Water Act Section 303(d) List/305(b) Report) lists the following impairments for San Pablo Bay: chlordane, dichlorodiphenyltrichloroethane, dieldrin, dioxin compounds (including 2, 3, 7, 8-TCDD), furan compounds, invasive species, mercury, polychlorinated biphenyls, and selenium. San Pablo Creek is impaired for diazinon and trash.

### 4. WCCSL's Storm Water Sample Results

The following discharges of pollutants from the Facility have violated the discharge prohibitions, effluent limitations, and receiving water limitations of the Permit:

Notice of Violation and Intent To File Suit
August 24, 2020
Page 9

      **a.**      **Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 1/17/2020 | WCL-08 | TSS | 2600 | 100 |
| 12/18/2019 | WCL-08 | TSS | 290 | 100 |
| 3/20/2019 | WCL-08 | TSS | 210 | 100 |
| 2/26/2019 | WCL-11-E | TSS | 300 | 100 |
| 2/13/2019 | WCL-08 | TSS | 640 | 100 |
| 11/29/2018 | WCL-8 | TSS | 510 | 100 |
| 1/8/2018 | WCL-08 | TSS | 1200 | 100 |
| 12/8/2016 | WCL-8 | TSS | 160 | 100 |
| 3/7/2016 | WCL-8 | TSS | 302 | 100 |
| 1/6/2016 | WCL-11E | TSS | 1200 | 100 |
| 1/6/2016 | WCL-8 | TSS | 200 | 100 |
| 12/13/2015 | WCL-8 | TSS | 420 | 100 |
| 12/13/2015 | WCL 11 D | TSS | 150 | 100 |

      **b.**      **Discharge of Storm Water Containing Zinc (Zn) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 1/17/2020 | WCL-08 | Zn | 0.7 | 0.26 |
| 1/8/2018 | WCL-08 | Zn | 0.38 | 0.26 |

      **c.**      **Discharge of Storm Water Containing Iron (Fe) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 1/17/2020 | WCL-08 | Fe | 96 | 1.0 |
| 12/18/2019 | WCL-08 | Fe | 13 | 1.0 |
| 3/20/2019 | WCL-08 | Fe | 9.5 | 1.0 |
| 2/26/2019 | WCL-11-E | Fe | 13 | 1.0 |
| 2/13/2019 | WCL-08 | Fe | 29 | 1.0 |
| 2/13/2019 | WCL-11-E | Fe | 1.7 | 1.0 |
| 11/29/2018 | WCL-8 | Fe | 27 | 1.0 |
| 1/22/2018 | WCL-08 | Fe | 5.3 | 1.0 |
| 1/8/2018 | WCL-08 | Fe | 55 | 1.0 |

Notice of Violation and Intent To File Suit
August 24, 2020
Page 10

| 2/20/2017 | Composite of WCL-11-B, C, and D | Fe | 1.3 | 1.0 |
|---|---|---|---|---|
| 12/8/2016 | WCL-8 | Fe | 11 | 1.0 |
| 1/15/2016 | WCL-08 | Fe | 3.3 | 1.0 |
| 1/15/2016 | WCL 11-E | Fe | 170 | 1.0 |
| 1/6/2016 | WCL-11E | Fe | 40 | 1.0 |
| 1/6/2016 | WCL-8 | Fe | 11 | 1.0 |
| 1/6/2016 | WCL-11C | Fe | 2.5 | 1.0 |
| 12/13/2015 | WCL-8 | Fe | 26 | 1.0 |
| 12/13/2015 | WCL 11 D | Fe | 9.2 | 1.0 |
| 12/11/2015 | WCL-8 | Fe | 2 | 1.0 |

    **d.**    **Discharge of Storm Water Containing Aluminum (Al) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 1/17/2020 | WCL-08 | Al | 65 | 0.75 |
| 12/18/2019 | WCL-08 | Al | 8.9 | 0.75 |
| 3/20/2019 | WCL-08 | Al | 6.5 | 0.75 |
| 2/26/2019 | WCL-11-E | Al | 9 | 0.75 |
| 2/13/2019 | WCL-08 | Al | 21 | 0.75 |
| 2/13/2019 | WCL-11-E | Al | 1.4 | 0.75 |
| 2/5/2019 | WCL-08 | Al | 0.97 | 0.75 |
| 11/29/2018 | WCL-8 | Al | 17 | 0.75 |
| 1/22/2018 | WCL-08 | Al | 3.7 | 0.75 |
| 1/8/2018 | WCL-08 | Al | 38 | 0.75 |
| 12/8/2016 | WCL-8 | Al | 8.8 | 0.75 |
| 10/27/2016 | WCL-8 | Al | 2.4 | 0.75 |
| 10/27/2016 | WCL-8 | Al | 2.4 | 0.75 |
| 1/15/2016 | WCL-08 | Al | 2.5 | 0.75 |
| 1/15/2016 | WCL 11-E | Al | 53 | 0.75 |
| 1/6/2016 | WCL-8 | Al | 8 | 0.75 |
| 12/13/2015 | WCL-8 | Al | 21 | 0.75 |
| 12/13/2015 | WCL 11 D | Al | 9.4 | 0.75 |
| 12/11/2015 | WCL-8 | Al | 1.8 | 0.75 |

    **e.**    **Discharge of Storm Water Containing Chemical Oxygen Demand (COD) at Concentrations in Excess of Applicable EPA Benchmark Value**

Notice of Violation and Intent To File Suit
August 24, 2020
Page 11

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 1/17/2020 | WCL-08 | COD | 1100 | 120 |
| 1/17/2020 | WCL-11-C | COD | 250 | 120 |
| 1/17/2020 | WCL-11-E | COD | 220 | 120 |
| 1/17/2020 | WCL-11-D | COD | 180 | 120 |
| 1/17/2020 | WCL-11-J | COD | 230 | 120 |
| 1/17/2020 | WCL-11-F | COD | 160 | 120 |
| 1/17/2020 | WCL-11-G | COD | 280 | 120 |
| 12/18/2019 | WCL-08 | COD | 210 | 120 |
| 12/18/2019 | WCL-11-C | COD | 220 | 120 |
| 12/18/2019 | WCL-11-J | COD | 250 | 120 |
| 12/18/2019 | WCL-11-E | COD | 250 | 120 |
| 12/18/2019 | WCL-11-G | COD | 200 | 120 |
| 12/18/2019 | WCL-11-D | COD | 210 | 120 |
| 3/20/2019 | WCL-08 | COD | 240 | 120 |
| 3/20/2019 | WCL-11-E | COD | 330 | 120 |
| 2/26/2019 | WCL-11-E | COD | 250 | 120 |
| 2/26/2019 | WCL-08 | COD | 210 | 120 |
| 2/13/2019 | WCL-08 | COD | 280 | 120 |
| 2/13/2019 | WCL-11-E | COD | 240 | 120 |
| 2/5/2019 | WCL-11-E | COD | 320 | 120 |
| 11/29/2018 | WCL-8 | COD | 290 | 120 |
| 11/29/2018 | WCL-11E | COD | 190 | 120 |
| 1/22/2018 | Composite of WCL-11-D & WCL 11-E | COD | 190 | 120 |
| 1/8/2018 | WCL-08 | COD | 410 | 120 |
| 1/8/2018 | Composite of WCL-11-D & WCL 11-E | COD | 130 | 120 |
| 4/17/2017 | Composite of WCL-11-A, C, D, and E | COD | 190 | 120 |
| 2/20/2017 | Composite of WCL-11-B, C, and D | COD | 280 | 120 |
| 12/8/2016 | WCL-8 | COD | 130 | 120 |
| 10/27/2016 | WCL-8 | COD | 200 | 120 |
| 10/27/2016 | WCL-8 | COD | 200 | 120 |
| 1/15/2016 | WCL 11-E | COD | 250 | 120 |
| 12/13/2015 | WCL 11 D | COD | 950 | 120 |

      **f.**      **Discharge of Storm Water Containing Nitrate Plus Nitrite Nitrogen (N+N) at Concentrations in Excess of Applicable EPA Benchmark Value**

Notice of Violation and Intent To File Suit
August 24, 2020
Page 12

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 1/17/2020 | WCL-08 | N+N | 0.87 | 0.68 |
| 1/17/2020 | WCL-11-C | N+N | 87 | 0.68 |
| 1/17/2020 | WCL-11-E | N+N | 76 | 0.68 |
| 1/17/2020 | WCL-11-D | N+N | 46 | 0.68 |
| 1/17/2020 | WCL-11-J | N+N | 65 | 0.68 |
| 1/17/2020 | WCL-11-F | N+N | 37 | 0.68 |
| 1/17/2020 | WCL-11-G | N+N | 49 | 0.68 |
| 1/17/2020 | WCL-11-A | N+N | 1.7 | 0.68 |
| 12/18/2019 | WCL-08 | N+N | 4.4 | 0.68 |
| 12/18/2019 | WCL-11-C | N+N | 54 | 0.68 |
| 12/18/2019 | WCL-11-J | N+N | 83 | 0.68 |
| 12/18/2019 | WCL-11-E | N+N | 72 | 0.68 |
| 12/18/2019 | WCL-11-G | N+N | 77 | 0.68 |
| 12/18/2019 | WCL-11-D | N+N | 70 | 0.68 |
| 3/20/2019 | WCL-08 | N+N | 0.91 | 0.68 |
| 3/20/2019 | WCL-11-E | N+N | 71 | 0.68 |
| 2/26/2019 | WCL-11-E | N+N | 3.2 | 0.68 |
| 2/26/2019 | WCL-08 | N+N | 93 | 0.68 |
| 2/13/2019 | WCL-08 | N+N | 4.6 | 0.68 |
| 2/13/2019 | WCL-11-E | N+N | 110 | 0.68 |
| 2/5/2019 | WCL-08 | N+N | 12 | 0.68 |
| 2/5/2019 | WCL-11-E | N+N | 340 | 0.68 |
| 11/29/2018 | WCL-8 | N+N | 1.1 | 0.68 |
| 11/29/2018 | WCL-11E | N+N | 27 | 0.68 |
| 1/22/2018 | Composite of WCL-11-D & WCL 11-E | N+N | 12 | 0.68 |
| 1/8/2018 | WCL-08 | N+N | 1.7 | 0.68 |
| 1/8/2018 | Composite of WCL-11-D & WCL 11-E | N+N | 6.5 | 0.68 |
| 2/20/2017 | Composite of WCL-11-B, C, and D | N+N | 1.6 | 0.68 |
| 12/8/2016 | WCL-8 | N+N | 2.2 | 0.68 |
| 10/27/2016 | WCL-8 | N+N | 2.9 | 0.68 |
| 10/27/2016 | WCL-8 | N+N | 2.9 | 0.68 |
| 3/7/2016 | WCL-8 | N+N | 7.5 | 0.68 |
| 1/15/2016 | WCL-08 | N+N | 12 | 0.68 |
| 1/15/2016 | WCL 11-E | N+N | 260 | 0.68 |
| 1/6/2016 | WCL-11E | N+N | 0.94 | 0.68 |
| 1/6/2016 | WCL-11C | N+N | 94 | 0.68 |

Notice of Violation and Intent To File Suit
August 24, 2020
Page 13

g.   **Discharge of Storm Water Containing Phosphorus (P) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 1/17/2020 | WCL-08 | P | 2.9 | 2.0 |
| 1/17/2020 | WCL-11-C | P | 2.4 | 2.0 |
| 1/17/2020 | WCL-11-J | P | 2.2 | 2.0 |
| 1/8/2018 | Composite of WCL-11-D & WCL 11-E | P | 2.1 | 2.0 |
| 2/20/2017 | Composite of WCL-11-B, C, and D | P | 2.4 | 2.0 |
| 10/27/2016 | WCL-8 | P | 2.1 | 2.0 |
| 10/27/2016 | WCL-8 | P | 2.1 | 2.0 |
| 3/7/2016 | WCL-8 | P | 8.6 | 2.0 |
| 1/6/2016 | WCL-11E | P | 3.3 | 2.0 |
| 1/6/2016 | WCL-11C | P | 2.3 | 2.0 |
| 12/13/2015 | WCL-8 | P | 180 | 2.0 |

h.   **Discharge of Storm Water Containing pH at Levels Outside the EPA Threshold**

| Date | Discharge Point | Parameter | Measured pH (s.u.) | EPA Benchmark Threshold (s.u.) |
|---|---|---|---|---|
| 3/20/2019 | WCL-08 | pH | 9.4 | 6.0 – 9.0 |
| 3/20/2019 | WCL-11-E | pH | 9.5 | 6.0 – 9.0 |
| 2/26/2019 | WCL-11-E | pH | 9.5 | 6.0 – 9.0 |
| 2/13/2019 | WCL-08 | pH | 9.1 | 6.0 – 9.0 |
| 2/13/2019 | WCL-11-E | pH | 9.4 | 6.0 – 9.0 |
| 2/5/2019 | WCL-08 | pH | 9.4 | 6.0 – 9.0 |
| 2/5/2019 | WCL-11-E | pH | 9.1 | 6.0 – 9.0 |
| 1/22/2018 | WCL-08 | pH | 9.3 | 6.0 – 9.0 |
| 1/8/2018 | WCL-08 | pH | 9.6 | 6.0 – 9.0 |
| 2/20/2017 | WCL-11-C | pH | 9.4 | 6.0 – 9.0 |
| 2/20/2017 | WCL-11-D | pH | 9.1 | 6.0 – 9.0 |
| 1/15/2016 | WCL-08 | pH | 9.3 | 6.0 – 9.0 |
| 12/13/2015 | WCL-8 | pH | 9.3 | 6.0 – 9.0 |

i.   **WCCSL's Sample Results Are Evidence of Violations of the General Permit**

WCCSL's sample results demonstrate violations of the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations set forth above.  The discharges

Notice of Violation and Intent To File Suit
August 24, 2020
Page 14

of pollutants reported above cause, or threaten to cause, pollution, contamination, or nuisance in violation of Sections III.C and VI.C. of the General Permit.

WCCSL's exceedances of EPA benchmarks are evidence of WCCSL's failure to implement BMPs that comply with the BAT/BCT requirements of the General Permit. These exceedances demonstrate that WCCSL has violated Section V.A. of the General Permit by failing to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.

WCCSL's sample results are also evidence that WCCSL's discharges adversely affect human health or the environment in violation of Section VI.B of the General Permit. WCCSL's sample results demonstrate that WCCSL's discharges cause or contribute to violations of the Basin Plan discharge prohibitions and water quality standards discussed above in violation of Section VI.A of the General Permit. Specifically, WCCSL's discharges cause or contribute to violations of the Basin Plan's prohibition against discharging solid waste to surface waters or at any place where they would contact or whether they would be eventually transported to surface waters by placing waste materials associated with the composting operation throughout the Facility. The exceedances of pollutants measured in WCCSL's discharges cause or contribute to violations of the Basin Plan's narrative water quality standards for Floating Materials, Section 3.3.6, and Settleable Materials, Section 3.3.13. CSPA is informed and believes that WCCSL has known that its storm water contains pollutants at levels exceeding General Permit standards since at least August 24, 2015.

CSPA alleges that such violations occur each time storm water discharges from the Facility. **Attachment B** hereto, sets forth the specific rain dates on which CSPA alleges that WCCSL has discharged storm water containing impermissible levels of TSS, Fe, Al, COD, Zn, N+N, P, and pH in violation of the General Permit. General Permit, Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B. WCCSL may have had other violations that can only be fully identified and documented once discovery and investigation have been completed. Hence, to the extent possible, CSPA includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

## 5.    WCCSL Has Failed to Implement BAT and BCT

Dischargers must implement BMPs that satisfy the BAT/BCT requirements of the CWA and the General Permit to reduce or prevent discharges of pollutants in their storm water discharges. General Permit, Effluent Limitation V.A. To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges. *See* General Permit, Sections X.H.1-2.

WCCSL has failed to implement the minimum BMPs required by the General Permit, including: good housekeeping requirements; preventive maintenance requirements; spill and leak

Notice of Violation and Intent To File Suit
August 24, 2020
Page 15

prevention and response requirements; material handling and waste management requirements;
erosion and sediment controls; employee training and quality assurance; and record keeping.
Permit, Section X.H.1(a-g).  WCCSL has further failed to implement advanced BMPs necessary
to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT
standards, including: exposure minimization BMPs; containment and discharge reduction BMPs;
treatment control BMPs; or other advanced BMPs necessary to comply with the General
Permit's effluent limitation guidelines.  General Permit, Sections X.H.2.

       Each day that WCCSL has failed to develop and implement BAT and BCT at the Facility
in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act,
33 U.S.C. § 1311(a).  WCCSL has been in violation of the BAT and BCT requirements at the
Facility every day since at least August 24, 2015.

### 6.      WCCSL Has Failed to Implement an Adequate Monitoring Implementation Plan

       The General Permit requires dischargers to implement a Monitoring Implementation
Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers must identify
all storm water discharge locations.  General Permit, Section X.I.2.a.  Dischargers must then
conduct monthly visual observations of each drainage area, as well as visual observations during
discharge sampling events.  General Permit, Section XI.A.1 and 2.

       Dischargers must collect and analyze storm water samples from two (2) storm events
within the first half of each reporting year (July 1 to December 31) and two (2) storm events
during the second half of each reporting year (January 1 to June 3).  General Permit, Section
XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season for basic
parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain
industry-specific parameters set forth in Table 2 of the General Permit, and other pollutants
likely to be in the storm water discharged from the facility based on the pollutant source
assessment.  General Permit, Section XI.B.6.  Dischargers must submit all sampling and
analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling
event.  General Permit, Section XI.B.11.

       Facilities subject to federal storm water effluent limitation guidelines must collect and
analyze samples from QSEs for each regulated pollutant specified in Section XI.B of the General
Permit.  General Permit, Section XI.D.1.  Facilities subject to storm water ELGs are ineligible
for the Representative Sampling Reduction in Section XI.C.4 of the General Permit.  General
Permit, Section XI.D.3.

       WCCSL has failed to develop and implement an adequate Monitoring Implementation
Plan.  WCCSL has failed to collect samples from all discharge points during each sampling event
by not collecting samples of discharges going into Pond B, and by not collecting from all
perimeter discharge locations.  WCCSL did not collect the required number of samples during
the 2017/2018, 2018/2019, and 2019/2020 reporting periods.  WCCSL has failed to conduct an
adequate pollutant source assessment and identify all pollutants likely to be present at the

Notice of Violation and Intent To File Suit
August 24, 2020
Page 16

Facility.  Therefore, WCCSL has failed to analyze all samples for all required parameters, including any unknown parameters that could only be determined by performing an adequate pollutant source assessment.  WCCSL has also not analyzed all samples for all of the required parameters related to the ELGs pursuant to 40 C.F.R. §§ 445.21-23.  WCCSL improperly composites and combines samples by combining samples from separate drainage areas into one reported sample.

Each day that WCCSL has failed to develop and implement an adequate Monitoring Implementation Plan is a separate and distinct violation of the Act and Permit.  WCCSL has been in violation of the Monitoring Implementation Plan requirements every day since at least August 24, 2015.

### 7.      WCCSL Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan

The General Permit requires dischargers to develop and implement a site-specific SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.  *See id.*

Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS for any non-significant revisions not more than once every three (3) months in the reporting year.  General Permit, Section X.B.

CSPA's investigation indicates that WCCSL has been operating with an inadequately developed or implemented SWPPP in violation of General Permit requirements.  WCCSL has further failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's numerous NAL exceedances across multiple pollutant parameters.  The inadequacy of the development or implementation of the SWPPP is evidenced by the visibly deficient practices at the Facility, such as spreading waste materials in areas that drain to Pond B and to San Pablo Bay and San Pablo Creek.

WCCSL's SWPPP does not identify nor evaluate all sources of pollutants that may affect the quality of industrial storm water discharges because the SWPPP does not identify or evaluate the spreading of the waste materials throughout the Facility.  This flaw in the SWPPP undermines each section of WCCSL's SWPPP because a major source of pollutants has not been factored into the Facility's storm water management.  For example, the site map does not identify the areas where waste materials have been placed throughout the Facility, despite these being locations where materials are directly exposed to precipitation.  General Permit, Section X.E.3.e.  The pollutant source assessment is deficient because it fails to describe and assess this

Notice of Violation and Intent To File Suit
August 24, 2020
Page 17

source of potential pollutants.  General Permit, Section X.G.  Furthermore, the Lined Pond is not identified as a potential source of pollutants, despite the Regional Board's documentation of the Lined Pond being an actual source of pollutants in February of 2019.  None of the BMPs identified in the SWPPP address the waste materials spread throughout the Facility.  General Permit, Section X.H.

Each day WCCSL failed to develop and implement an adequate SWPPP is a violation of the General Permit.  The SWPPP violations described above were at all times in violation of Section X of the General Permit.  WCCSL has been in violation of these requirements at the Facility every day since at least August 24, 2015.

## 8.      WCCSL Has Failed to Comply with the Required Exceedance Response Actions

Section XII of the General Permit requires discharges to take certain actions if the results of their storm water monitoring samples exceed the Numeric Action Levels set forth in the Permit.  Dischargers enter Exceedance Response Action ("ERA") Level 1 if sampling results indicate an NAL exceedance.  General Permit, Section XII.C.  Dischargers enter Level 1 on July 1 following the reporting year during which the exceedance(s) occurred.  *Id*.  By October 1 following commencement of Level 1 status, dischargers are required to complete an ERA Level 1 Evaluation.  General Permit, Section XII.C.1.  By January 1 following the commencement of Level 1 dischargers are required to revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation and certify and submit via SMARTS a Level 1 ERA Report prepared by a QISP.  General Permit, Section XII.C.2.  If sampling results indicate an NAL exceedance for an ERA Level 1 parameter, the discharger's status will change to Level 2, on July 1, for that parameter.  General Permit, Section XII.D.  By January 1 following the commencement of Level 2 status, the discharger shall complete a Level 2 ERA Action Plan.  General Permit, Section XII.D.1.  One year later, on January 1 following the submittal of the Level 2 ERA Action Plan, the discharger is required to complete a Level 2 ERA Technical Report.  General Permit, Section XII.D.2.

WCCSL entered into ERA Level 2 for aluminum, iron, chemical oxygen demand, and nitrate plus nitrite nitrogen on July 1, 2017.  WCCSL's ERA evaluations and reports are deficient because they fail to identify and address a key source of pollution at the Facility – the spreading of waste materials outside permit and control boundaries.  The June 30, 2019 ERA Level 2 Technical Report is further deficient because it fails to identify any improvements to the Lined Pond which resulted in discharges of contaminated storm water to Pond B, a water of the United States.

Each day WCCSL failed to adequately complete the required Exceedance Response Actions above is a violation of the General Permit.  The ERA violations described above were at all times in violation of Section XII of the General Permit.  WCCSL has been in violation of these requirements at the Facility every day since at least August 24, 2015.

Notice of Violation and Intent To File Suit
August 24, 2020
Page 18

## III.   Persons Responsible for the Violations

CSPA puts WCCSL on notice that they are the persons and entities responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts WCCSL on formal notice that it intends to include those persons in this action.

## IV.   Name and Address of Noticing Parties

The name, address and telephone number of each of the noticing parties is as follows:

Bill Jennings, Executive Director
California Sportfishing Protection Alliance
3536 Rainer Avenue
Stockton, CA 95204
(209) 464-5067

## V.   Counsel

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard                           Reed Super
William N. Carlon                           Edan Rotenberg
Law Offices Of Andrew L. Packard            Super Law Group
245 Kentucky Street, Suite B3               180 Maiden Lane, Suite 603
Petaluma, CA 94952                          New York, NY 10038
(707) 782-4060                              (212) 242-2355
andrew@packardlawoffices.com                reed@superlawgroup.com
wncarlon@packardlawoffices.com              edan@superlawgroup.com

William Verick
Klamath Environmental Law
Center
1125 16th Street, Suite 204
Arcata, CA 95521
(707) 630-5061
wverick@igc.org

## VI.   Conclusion

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the CWA against WCCSL and their agents for the above-referenced violations upon the expiration of the 60-day notice

Notice of Violation and Intent To File Suit
August 24, 2020
Page 19

period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Andrew L. Packard
Law Offices of Andrew L. Packard
Counsel for CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

Notice of Violation and Intent To File Suit
August 24, 2020
Page 20

## SERVICE LIST

### VIA CERTIFIED MAIL

Andrew Wheeler, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

John Busterud, Regional Administrator
U.S. Environmental Protection Agency, Region IX
75 Hawthorne Street
San Francisco, CA 94105

William Barr, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Eileen Sobeck, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812

Michael Montgomery, Executive Officer
San Francisco Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612

# ATTACHMENT A



**West Contra Costa Sanitary Landfill, Inc.**

Historical Satellite Imagery Documenting Unlawful Compost Spreading

February 8, 2011

Parr Blvd

Garden Tract Rd

Google Earth

Image © 2020 Maxar Technologies

1000 ft



**West Contra Costa Sanitary Landfill, Inc.**

Historical Satellite Imagery Documenting Unlawful Compost Spreading

August 2011



West Contra Costa Sanitary Landfill, Inc.

Historical Satellite Imagery Documenting Unlawful Compost Spreading

September 2011



West Contra Costa Sanitary Landfill, Inc.

Historical Satellite Imagery Documenting Unlawful Compost Spreading

October 11, 2011

Google Earth

1000 ft



West Contra Costa Sanitary Landfill, Inc.

Historical Satellite Imagery Documenting Unlawful Compost Spreading

June 13, 2012



**West Contra Costa Sanitary Landfill, Inc.**
Historical Satellite Imagery Documenting Unlawful Compost Spreading

July 17, 2012



# West Contra Costa Sanitary Landfill, Inc.

Historical Satellite Imagery Documenting Unlawful Compost Spreading

August 6, 2012

Google Earth

1000 ft



**West Contra Costa Sanitary Landfill, Inc.**

Historical Satellite Imagery Documenting Unlawful Compost Spreading

August 23, 2012

Parr Blvd

Garden Tract Rd

Google Earth

1000 ft



West Contra Costa Sanitary Landfill, Inc.

Historical Satellite Imagery Documenting Unlawful Compost Spreading

April 16, 2013



West Contra Costa Sanitary Landfill, Inc.

Historical Satellite Imagery Documenting Unlawful Compost Spreading

June 1, 2013

Google Earth

1000 ft



West Contra Costa Sanitary Landfill, Inc.

Historical Satellite Imagery Documenting Unlawful Compost Spreading

October 10, 2013

Google Earth

Image © 2020 Maxar Technologies

1000 ft



# West Contra Costa Sanitary Landfill, Inc.

Historical Satellite Imagery Documenting Unlawful Compost Spreading

March 22, 2014

Par Blvd

Garden Tract Rd

Google Earth

1000 ft



# West Contra Costa Sanitary Landfill, Inc.

Historical Satellite Imagery Documenting Unlawful Compost Spreading

August 13, 2016

Google Earth

1000 ft



West Contra Costa Sanitary Landfill, Inc.

Historical Satellite Imagery Documenting Unlawful Compost Spreading

November 3, 2016

Google Earth



**West Contra Costa Sanitary Landfill, Inc.**

Historical Satellite Imagery Documenting Unlawful Compost Spreading

August 31, 2017

Parr Blvd

Garden Tract Rd

Google Earth

N

1000 ft

**ATTACHMENT B**
**Notice of Intent to File Suit, WCCSL**
**Significant Rain Events,* August 24, 2015 – August 21, 2020**

| | | | |
|---|---|---|---|
| November 2, 2015 | October 25, 2016 | February 9, 2017 | February 26, 2018 |
| November 9, 2015 | October 28, 2016 | February 10, 2017 | March 1, 2018 |
| November 15, 2015 | October 31, 2016 | February 16, 2017 | March 2, 2018 |
| November 24, 2015 | November 19, 2016 | February 17, 2017 | March 3, 2018 |
| December 21, 2015 | November 20, 2016 | February 18, 2017 | March 8, 2018 |
| December 22, 2015 | November 21, 2016 | February 19, 2017 | March 13, 2018 |
| December 24, 2015 | November 23, 2016 | February 20, 2017 | March 14, 2018 |
| January 5, 2016 | November 26, 2016 | February 21, 2017 | March 15, 2018 |
| January 6, 2016 | November 27, 2016 | February 22, 2017 | March 16, 2018 |
| January 7, 2016 | December 8, 2016 | March 5, 2017 | March 18, 2018 |
| January 9, 2016 | December 9, 2016 | March 6, 2017 | March 20, 2018 |
| January 13, 2016 | December 10, 2016 | March 21, 2017 | March 21, 2018 |
| January 15, 2016 | December 11, 2016 | March 22, 2017 | March 22, 2018 |
| January 16, 2016 | December 14, 2016 | March 24, 2017 | March 24, 2018 |
| January 17, 2016 | December 16, 2016 | March 25, 2017 | April 6, 2018 |
| January 18, 2016 | December 23, 2016 | April 7, 2017 | April 7, 2018 |
| January 19, 2016 | December 24, 2016 | April 8, 2017 | April 12, 2018 |
| January 20, 2016 | January 2, 2017 | April 12, 2017 | April 15, 2018 |
| January 22, 2016 | January 3, 2017 | April 13, 2017 | April 16, 2018 |
| January 23, 2016 | January 4, 2017 | April 16, 2017 | April 17, 2018 |
| January 24, 2016 | January 5, 2017 | April 17, 2017 | November 22, 2018 |
| January 30, 2016 | January 7, 2017 | April 18, 2017 | November 23, 2018 |
| February 18, 2016 | January 8, 2017 | April 20, 2017 | November 24, 2018 |
| March 5, 2016 | January 9, 2017 | June 9, 2017 | November 27, 2018 |
| March 6, 2016 | January 10, 2017 | October 20, 2017 | November 29, 2018 |
| March 7, 2016 | January 11, 2017 | November 9, 2017 | November 30, 2018 |
| March 11, 2016 | January 12, 2017 | November 16, 2017 | December 1, 2018 |
| March 12, 2016 | January 18, 2017 | November 17, 2017 | December 5, 2018 |
| March 13, 2016 | January 19, 2017 | November 26, 2017 | December 6, 2018 |
| March 14, 2016 | January 20, 2017 | November 27, 2017 | December 14, 2018 |
| March 21, 2016 | January 21, 2017 | January 4, 2018 | December 17, 2018 |
| April 9, 2016 | January 22, 2017 | January 6, 2018 | December 21, 2018 |
| April 10, 2016 | January 23, 2017 | January 8, 2018 | December 25, 2018 |
| April 14, 2016 | January 24, 2017 | January 9, 2018 | January 6, 2019 |
| April 22, 2016 | February 2, 2017 | January 18, 2018 | January 7, 2019 |
| May 6, 2016 | February 3, 2017 | January 19, 2018 | January 9, 2019 |
| May 7, 2016 | February 4, 2017 | January 22, 2018 | January 10, 2019 |
| May 8, 2016 | February 5, 2017 | January 25, 2018 | January 12, 2019 |
| October 15, 2016 | February 6, 2017 | January 26, 2018 | January 16, 2019 |
| October 16, 2016 | February 7, 2017 | January 27, 2018 | January 17, 2019 |
| October 17, 2016 | February 8, 2017 | January 28, 2018 | January 21, 2019 |

* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**ATTACHMENT B**
**Notice of Intent to File Suit, WCCSL**
**Significant Rain Events,* August 24, 2015 – August 21, 2020**

| | |
|---|---|
| January 22, 2019 | December 9, 2019 |
| January 31, 2019 | December 11, 2019 |
| February 2, 2019 | December 12, 2019 |
| February 3, 2019 | December 18, 2019 |
| February 4, 2019 | December 19, 2019 |
| February 5, 2019 | December 22, 2019 |
| February 9, 2019 | December 26, 2019 |
| February 10, 2019 | December 29, 2019 |
| February 12, 2019 | December 30, 2019 |
| February 13, 2019 | January 9, 2020 |
| February 14, 2019 | January 16, 2020 |
| February 15, 2019 | January 22, 2020 |
| February 25, 2019 | March 7, 2020 |
| February 26, 2019 | March 14, 2020 |
| February 27, 2019 | March 15, 2020 |
| March 2, 2019 | March 24, 2020 |
| March 5, 2019 | April 5, 2020 |
| March 6, 2019 | April 7, 2020 |
| March 9, 2019 | May 12, 2020 |
| March 11, 2019 | May 17, 2020 |
| March 20, 2019 | May 18, 2020 |
| March 22, 2019 | December 9, 2019 |
| March 23, 2019 | December 11, 2019 |
| March 26, 2019 | December 12, 2019 |
| March 27, 2019 | December 18, 2019 |
| March 28, 2019 | December 19, 2019 |
| April 2, 2019 | December 22, 2019 |
| April 5, 2019 | December 26, 2019 |
| April 16, 2019 | December 29, 2019 |
| May 15, 2019 | December 30, 2019 |
| May 16, 2019 | January 9, 2020 |
| May 18, 2019 | January 16, 2020 |
| May 19, 2019 | January 22, 2020 |
| May 22, 2019 | March 7, 2020 |
| November 26, 2019 | March 14, 2020 |
| November 27, 2019 | March 15, 2020 |
| December 1, 2019 | March 24, 2020 |
| December 2, 2019 | April 5, 2020 |
| December 4, 2019 | April 7, 2020 |
| December 7, 2019 | May 12, 2020 |
| December 8, 2019 | May 17, 2020 |

* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.